## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| HOLLY H. LARSEN, | ) | Case No. 09-02630-TLM |
| | ) | |
| Debtor. | ) | Chapter 11 |
| _____ | ) | |

### MEMORANDUM OF DECISION
_____

**INTRODUCTION**

The issue before the Court in this chapter 11 case is approval of a proposed disclosure statement under § 1125.[1]  The question of such approval was heard on April 18, 2011, and taken under advisement on April 25 following submission of post-hearing briefs.  *See* Doc. Nos. 149, 151.  The Court determines that the proposed disclosure statement shall be approved.  To the extent required, this Decision constitutes findings and conclusions under Fed. R. Bankr. P. 7052 and 9014.

---

[1] All statutory references are to Title 11, U.S. Code §§ 101-1532 (the "Bankruptcy Code" or "Code") unless otherwise indicated.

MEMORANDUM OF DECISION - 1

**FACTS**[2]

Holly Larsen ("Debtor") filed a voluntary chapter 11 case on August 31, 2009, but no plan has yet been confirmed, an interregnum resulting from, in part, a lengthy dispute over approval of employment of Debtor's original counsel, which was finally resolved with new counsel appearing in the spring of 2010. Plan proposals followed a Court-ordered status conference which occurred in the summer of 2010. Debtor's "Third Amended Disclosure Statement," Doc. No. 141 ("Disclosure Statement"), the disclosure statement currently before the Court, was filed on March 16, 2011, accompanied by her "Third Amended Plan," Doc. No. 142 ("Plan").

In her original schedules, Debtor indicated she had over $1.1 million in assets[3] and $732,000 in liabilities to creditors. Among those creditors were ten unsecured creditors holding a total of $184,629.75 in claims. Doc. No. 24 at 16-17 (Schedule F). Of this amount, $113,923 was scheduled as owed to Brundage Mountain Air, Inc. ("BMA") and David Eaton based upon a "lawsuit," $70,000

---

[2] As no evidence was presented at hearing, and since the issue is primarily an interpretation of the legal sufficiency of the disclosure statement, the recitation of facts is relatively brief. The Court takes judicial notice of its files and records, Fed. R. Evid. 201, in order to lay a factual background for the issue presented.

[3] In amended schedules filed in September, 2010, Debtor's assets were reduced to approximately $886,000. Doc. No. 115 at 6-10. These assets included multiple parcels of real property, a number of IRA and pension assets that were claimed as exempt, and Debtor's ownership interests in Creative Children's Center, Inc. (100%), Idaho Mountain Air, LLC (99%), and Mountain Aire, LLC (99%), but with "unknown" values.

MEMORANDUM OF DECISION - 2

was scheduled as owed to two attorneys, and the balance (a mere $706.75) was owed to several "credit card" companies and a cell phone provider. *Id.* The amended schedules, filed in September, 2010, identified 16 unsecured creditors with total claims of $212,880.95. Therein, Debtor listed the BMA and Eaton lawsuit claim at $139,767.18, the claims of Debtor's former attorneys at $53,802.32, and the balance of the "credit card" and other creditor claims at $19,311.45. Doc. No. 115 at 16-19. The claim amounts listed in the amended schedules for Eaton/BMA and Debtor's former attorneys match the proofs of claim filed by those creditors. *See* Claim Nos. 5-2, 19-1, and 20-1. However, proofs of claim filed for unsecured credit card and other similar obligations total $20,884.73, approximately $1,500 more than the $19,311.45 total listed in Debtors' amended schedules.[4]

The Disclosure Statement explains that Debtor's financial difficulties stemmed from the failed acquisition of a radio station and broadcast license in Valley County, Idaho, which ultimately resulted in litigation with BMA and Eaton. Debtor indicates she "lost her claims in arbitration" and Eaton was awarded $139,767.18. Doc No. 141 at 2-5.

---

[4] Mathematically, Eaton and BMA hold approximately 65% of the total filed proofs of claim of unsecured creditors. Two-thirds of the $214,454.23 total would be $142,969.49. These percentages and the composition of the unsecured creditor class(es) have potential ramifications given how plan acceptances are calculated. *See* § 1126(c).

MEMORANDUM OF DECISION - 3

The Plan places all secured creditors in a single class (Class 2), alleging all are "unimpaired" and will be paid pursuant to their loan documents. Class 1 is reserved for priority claims. Class 5 is for "guaranteed" debts that are being paid by a primary obligor, and for whom no distribution in Debtor's case is contemplated. Class 6 is the interests of Debtor.

The issue before the Court relates to the classification and treatment of unsecured creditors. Class 3, characterized by Debtor as "unsecured trade creditors," includes all credit card debts and credit agreements (other than any guaranteed debts in Class 5), as well as the attorney's fees of Debtor's prebankruptcy attorneys. These creditors are to receive 100% of their claims over a four-year period. Debtor's Class 4 is characterized as "unsecured judgment creditors" and includes only BMA and Eaton. Debtor proposes to give these creditors a new promissory note in the amount of $66,925.21, slightly less than half of their asserted claim. The note is to bear interest at 3.25% per annum, and is to be secured by a deed of trust on real property located in Boise, Idaho that is "owned by Debtor's IRA." Doc. Nos. 141 at 8-11, and 142 at 1-4. Given the amount of the note, as compared to either the scheduled claims of Eaton and BMA or those creditors' proofs of claim, it is clear that less than 100% of the claim will be paid. The Disclosure Statement and Plan note: "Any amounts above the Note

described in the Plan to [Eaton and BMA] remaining due and owing upon the expiration of the plan term will be discharged." *Id.* at 10, and at 4.[5]

Debtor's reasoning for the classification of unsecured creditors is set out in the Plan. There, Debtor defines Class 3 as:

> A general class of unsecured creditors classified as "trade creditors", or creditors with whom the Debtor has, or did have, a current ongoing relationship.

Doc. No. 142 at 2. Class 4 is defined as:

> A general class of unsecured creditors classified as "judgment creditors," or creditors who currently hold a judgment against the Debtor and with whom the Debtor does not have any ongoing business relationship.

*Id.*

## DISCUSSION AND DISPOSITION

Eaton and BMA objected to confirmation of the Plan. Doc. No. 146. That objection specifically raised , *inter alia*, the issue that Debtor had "improperly categorized" the unsecured creditors into two dissimilarly treated classes in violation of § 1122 and § 1123(a)(4). Eaton and BMA did not specifically object to approval of the Disclosure Statement, and there were no other objections to

---

[5] Funding of the Plan is to come from Debtor's regular income and also from the sale, by a Debtor-owned limited liability company, of certain real estate. The net proceeds of such sale will be distributed to her as owner of the LLC and then contributed by her to payment of claims in this case. Doc. No. 141 at 11. Real estate proceeds may accelerate payment of the note amount to Eaton/BMA, but will not increase the amount to be paid. *See* Doc. No. 142 at 6-7.

MEMORANDUM OF DECISION - 5

such approval filed.[6] However, as the classification issue was so clearly implicated, the Court inquired of counsel for Debtor and Eaton/BMA, as well as the United States Trustee, at hearing. Because proceeding to confirmation would impose a cost on all litigants, and perhaps unreasonably so should the classification proposed by Debtor not pass muster, the Court required submissions to address the matter.[7]

### A. Classification

Most courts have agreed that § 1122 contemplates some limits on the separate classification of similar claims. Although noting that similar claims may be placed in different classes, the court in *Greystone* found that "[there is] one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." This principle has been adopted by a majority of the Circuits that have addressed the issue.

---

[6] Though at the time of the disclosure statement hearing Eaton and BMA had not objected specifically to approval of Debtor's Disclosure Statement, they did file, following the Court's comments and invitation to submit post-hearing briefs at the April 18 hearing, a post-hearing objection to approval of the Disclosure Statement for the same reasons they object to confirmation of Debtor's Plan — that is, the improper classification of claims. *See* Doc. No. 149.

[7] Ordinarily, confirmation issues are reserved for the confirmation hearing, and not addressed at the disclosure statement stage. However, if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing. *See*, *e.g.*, *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Mass. 2002); *In re Silberkraus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000); *In re Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990). Such action must be used carefully so as not to convert the disclosure statement hearing into a confirmation hearing, and to insure that due process concerns are protected. *Brass Corp.*, 194 B.R. at 422 (citing *Cardinal Congregate I*, 121 B.R. at 764).

MEMORANDUM OF DECISION - 6

*Barakat v. Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520, 1524-25 (9th Cir. 1996) (adopting the Fifth Circuit's analysis in *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991)) (internal citations omitted). *Barakat* continued:

> The Ninth Circuit BAP decision in [*Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage Inc.)*, 166 B.R. 892, 897 (9th Cir. BAP 1994)], agreed with the "one clear rule" discussed by *Greystone III*, 995 F.2d at 1279, that a debtor cannot "classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." The *Tucson Self-Storage* court held that, absent a business or economic justification, separate classification of unsecured claims solely on their right to make a § 1111(b)(2) election is an impermissible classification in violation of § 1122(a). We agree with the principles enunciated in the *Greystone III* line of cases, that is, absent legitimate business or economic justification, it is impermissible for Debtor to classify LICV's deficiency claim separately from general unsecured claims.

*Id.* at 1526.

Here, the "business or economic justification" for the separate classification is allegedly the "trade debt" nature of the Class 3 claims. As Debtor states in her Plan, Class 3 claims are "creditors with whom the Debtor has, or did have, a current ongoing business relationship." Doc. No. 142 at 2. Setting aside the conundrum created by the past-tense phrase "or did have" (which belies the idea that treatment should be different because the creditors have "ongoing" relationships), this justification is suspect.

MEMORANDUM OF DECISION - 7

For example, there is a problem with the argument that the attorneys who represented Debtor in her pre-bankruptcy disputes with Eaton and BMA have a "current ongoing business relationship" with her. Recall, Debtor has been in chapter 11 for almost two years. There have been no efforts during the pendency of this case to seek Court approval of the employment of either of these firms as special counsel or otherwise. There can be no "ongoing" legal representation or relationship with either firm without compliance with the employment approval requirements of § 327.[8]

Debtor argues that the other "trade" debt consists of "credit card or other consumer credit issuers which the Debtor uses on a continuing basis for the operation of her day-care [business]." Doc. No. 151 at 3-4. She states: "These credit cards or other consumer accounts are frequently used to pay business expenses related to the Debtor's business and, in large part, have remained open during the pendency of the Debtor's bankruptcy." *Id.* at 4.

The payments required under the Plan will be funded by Debtor's monthly net disposable income (and net income of Debtor's non-filing spouse) of $1,761.81. Doc. No. 141 at 11 (referencing Schedules I and J). The amended schedules filed in September, 2010, indicate that this income flows from Debtor's

---

[8] Debtor argues in her post-hearing brief that the relationship with the Boise law firm "began prior to [the Eaton/BMA] lawsuit and continues as the Debtor (or her companies) needs further legal advice." Doc. No. 151 at 4. How it "continues" given § 327 requirements is unexplained.

MEMORANDUM OF DECISION - 8

closely-held business, "Creative Child Center, Inc." Doc. No. 115 at 8 (Schedule B, showing 100% ownership but "unknown" value of that corporation), and 22-24 (Schedules I and J).

Even ignoring for the moment the hedging nature of the argument (*i.e.*, that "in large part" the credit relationships remain open), resolution of the issue will require proof. One may legitimately question whether each (or even most) of the dozen or so credit card accounts listed in the schedules and filed proofs of claim as having unpaid balances in 2009 are currently active credit accounts and thus represent "current ongoing business relationships" that "have remained open during the . . . bankruptcy."[9] But such issues cannot be resolved at this time on this record. The Court can neither accept the uncorroborated and, at times, equivocal representations of Debtor and find the classification permissible, nor can it reject those representations and find the classification improper as that would require surmise and speculation. In short, the classification issue is one for confirmation to be decided on the evidence, and cannot be resolved at this stage of the proceedings.

---

[9] In considering the justification, the Court briefly reviewed the Debtor's monthly operating reports. The same appear to indicate that Debtor uses debit cards, not credit cards, though the amount of detail provided in the reports is inadequate to conclusively establish that fact. One might reasonably assume that credit card providers would not allow continued use of a card that had an unpaid balance at filing, and of course no authority exists to allow Debtor to satisfy that unpaid balance in order to continue to use the subject card(s) or account(s). Debtor has not established that these same creditors listed in the bankruptcy created new, post-petition unsecured credit card facilities.

MEMORANDUM OF DECISION - 9

**CONCLUSION**

Upon the record before it, and in light of the nature of the arguments of the parties, the Court determines that the Disclosure Statement will be approved. Whether the separate classification of Eaton/BMA with dissimilar treatment from other unsecured creditors is violative of § 1122 and § 1123(a)(4), and whether that in turn violates § 1129(a)(1)-(a)(3) or other applicable confirmation standards, is an issue that will be presented and decided at the confirmation hearing. *See Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir. 1997) (imposing burden on debtor as the plan proponent to prove that the confirmation requirements of § 1129 have been met, and recognizing the bankruptcy court's independent, affirmative duty to ensure that the plan satisfies the same).[10]

Debtor shall provide an appropriate form of Order approving the Disclosure Statement, setting deadlines for filing acceptances and rejections of the Plan and for filing objections to confirmation, and scheduling a confirmation hearing.

---

[10] This Decision is limited to approval of Debtor's Disclosure Statement. Accordingly, the Court expresses no opinion, and no conclusion is reached, on any confirmation issues. Such issues will be reserved for confirmation.

DATED: May 3, 2011



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 11